# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL ROBERT PAPPAS, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-008115 |
| U.S. BANK HOME MORTGAGE, N.A.; CENLAR CENTRAL LOAN ADMINISTRATION; EXPERIAN INFORMATION SOLUTIONS, INC. and EQUIFAX INFORMATION SERVICES, LLC, | Hon. Amy J. St. Eve |
| Defendants. | |

**DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Adam W. Wiers
awwiers@jonesday.com
Michael A. Zuckerman
mzuckerman@jonesday.com
Christopher A. Hall
chall@jonesday.com
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL 60601.1692
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585

*Counsel for Defendant Experian
Information Solutions, Inc.*

# TABLE OF CONTENTS

Page

I.    LEGAL LANDSCAPE ................................................................................ 2
      A.    The Fair Credit Reporting Act. ...................................................... 2
      B.    Chapter 13 of the U.S. Bankruptcy Code. ..................................... 2
II.   FACTUAL BACKGROUND ........................................................................ 3
      A.    The Parties .................................................................................... 3
      B.    Plaintiff's Chapter 13 Bankruptcy ............................................... 4
      C.    Experian's Bankruptcy Reporting Policies and Procedures. ........ 6
      D.    Experian's Bankruptcy-related Reinvestigation Procedures ........ 6
      E.    Plaintiff's Vacation Home Purchase, Dispute to Experian, and Experian's Response. ............................................................................... 7
      F.    The Account History Block. ......................................................... 9
III.  CLAIMS AGAINST EXPERIAN ................................................................ 10

# ARGUMENT

I.    PLAINTIFF CANNOT ESTABLISH DAMAGE CAUSATION. ............................... 12
II.   EXPERIAN'S GENERAL CHAPTER 13 BANKRUPTCY REPORTING PROCEDURES ARE REASONABLE. .................................................................. 15
      A.    Experian's Procedures Were Reasonable Prior to Receipt of Plaintiff's Dispute. ................................................................................. 16
      B.    There Are No Inaccuracies Post-Dispute ..................................... 18
III.  EXPERIAN REASONABLY REINVESTIGATED PLAINTIFF'S DISPUTE ............. 18
      A.    There is No Evidence of an Inaccurate Credit Report. ................. 19
      B.    Plaintiff Has Not Suffered Any Post-dispute Damage. ................ 19
      C.    Lack of Evidence of Unreasonable Reinvestigation. .................... 20
IV.   EXPERIAN DID NOT WILLFULLY VIOLATE THE FAIR CREDIT REPORTING ACT ................................................................................... 23

# TABLE OF AUTHORITIES

Page

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................15

*Bagby v. Experian Info. Sols., Inc.*,
162 F. App'x 600 (7th Cir. 2006)...........................................................................17

*Benson v. Trans Union, LLC*,
387 F. Supp. 2d 834 (N.D. Ill. 2005) ...............................................................25, 26

*Childress v. Experian Info. Sols., Inc.*,
790 F.3d 745 (7th Cir. 2015) ...................................................................20, 21, 28

*Collins v. Am. Red Cross*,
715 F.3d 994 (7th Cir. 2013) ..................................................................................15

*Crabill v. Trans Union, L.L.C.*,
259 F.3d 662 (7th Cir. 2001) ............................................................................17, 24

*Crawford v. Countrywide Home Loans, Inc.*,
647 F.3d 642 (7th Cir. 2011) ..................................................................................15

*DeAndrade v. Trans Union LLC*,
523 F.3d 61 (1st Cir. 2008)......................................................................................21

*Henson v. CSC Credit Servs.*,
29 F.3d 280 (7th Cir. 1994) ...................................................................20, 22, 23

*Hupfauer v. Experian*,
No. 16-cv-0475, 2016 WL 4506798 (N.D. Ill. Aug. 23, 2016) .........................21, 28

*In re Irby*,
337 B.R. 293 (Bankr. N.D. Ohio 2005) ................................................................25

*In re Smith*,
582 F.3d 767 (7th Cir. 2009) ....................................................................................7

*In re Witkowski*,
16 F.3d 739 (7th Cir. 1994) ......................................................................................6

*Johnson v. Home State Bank*,
    501 U.S. 78 (1991) ........................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................15

*Molina v. Experian Credit Info. Sols.*,
    No. 02 C 5561, 2005 WL 5525336 (N.D. Ill. Jan. 19, 2005) ................................19

*Morris v. Trans Union LLC*,
    420 F. Supp. 2d 733 (S.D. Tex. 2006), *aff'd*, 224 F. App'x 415 (5th Cir. 2007) ....................26

*Murray v. New Cingular Wireless Servs., Inc.*,
    232 F.R.D. 295 (N.D. Ill. 2005) ........................................................................18

*Murray v. New Cingular Wireless Servs., Inc.*,
    523 F.3d 719 (7th Cir. 2008) ............................................................................28

*Paul v. Experian Info. Sols., Inc.*,
    793 F. Supp. 2d 1098 (D. Minn. 2011) ..............................................................26

*Ruffin-Thompkins v. Experian Info. Sols., Inc.*,
    422 F.3d 603 (7th Cir. 2005) .......................................................................19, 22

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ........................................................................6, 21, 27, 28

*Sarver v. Experian Info. Sols., Inc.*,
    299 F. Supp. 2d 875 (N.D. Ill.), *aff'd sub nom. Sarver v. Experian Info. Sols.*,
    390 F.3d 969 (7th Cir. 2004)
    ........................................................................................16, 17, 20, 24

*Shlahtichman v. 1-800 Contacts, Inc.*,
    615 F.3d 794 (7th Cir. 2010) ............................................................................28

*Van Straaten v. Shell Oil Prods. Co.*,
    678 F.3d 486 (7th Cir. 2012) (Cudahy, J., concurring) ........................................27

STATUTES

11 U.S.C. § 524(a) ..............................................................................................25

11 U.S.C. § 109(e) ................................................................................................6

11 U.S.C. § 1301 *et seq.* ................................................................6

11 U.S.C. § 1307(c) ...................................................................7

11 U.S.C. §§ 1322(a)(4), 1328(e) .................................................7

11 U.S.C. § 1325(a)(5) ...............................................................7

11 U.S.C. § 1328(a) ...................................................................7

15 U.S.C. 1681g(a) ...................................................................14

15 U.S.C. § 1681e(b) .............................................................19, 23

15 U.S.C. 1681i .......................................................................23

15 U.S.C. § 1681i(a) .................................................................22

## OTHER AUTHORITIES

FEDERAL RULE OF CIVIL PROCEDURE 56 ...........................................15

KEY DIMENSIONS AND PROESSES IN THE U.S. CREDIT REPORTING SYSTEM................26

REPORT TO CONGRESS ON THE FAIR CREDIT REPORTING ACT..........................26

Case: 1:15-cv-11140 Document #: 102 Filed: 10/13/16 Page 6 of 32 PageID #:900

## NATURE OF THE CASE

This case involves the intersection of consumer credit reporting and consumer bankruptcy. Plaintiff, a high-income earning individual, well-versed in the credit industry, elected to file a Chapter 13 bankruptcy in order to selectively walk away from certain unprofitable real estate investments while keeping his profitable ones. Despite knowing full-well that bankruptcy would make it harder to obtain credit afterwards, Plaintiff—lured by the chance to shed debt related to his underwater properties for free—opted to file anyway. Plaintiff's bankruptcy got him exactly what he wanted and then some. He stopped making his mortgage payments on the houses he deemed bad investments, managed to walk away from tens, if not hundreds, of thousands of dollars in debt, and all the while continued to collect rental income for years on the properties he had supposedly surrendered in the bankruptcy, pocketing tens of thousands of additional dollars.

Everything worked out beautifully for Plaintiff, but he was not satisfied. Experian entered the picture when, just a bit more than a year removed from his bankruptcy discharge and before the foreclosures had been completed on the houses Plaintiff surrendered in the bankruptcy, Plaintiff decided that he wanted a second vacation home to compliment the one he already had, on top of his multiple investment properties. When he approached several mortgage brokers, Plaintiff was told that he could not get a mortgage so close in time after filing bankruptcy or, at least until the foreclosure proceedings were complete on the surrendered properties. Plaintiff blames this on Experian, claiming that his failure to be immediately approved for yet another mortgage on yet another vacation home was somehow the result of inaccurate reporting on Experian's part, as opposed to being the obvious result of Plaintiff's choice to file bankruptcy in the first place. The plain facts in the record, however, demonstrate

1

that Experian's reporting was accurate and that any supposed inaccurate reporting did not cause Plaintiff damage. Plaintiff has long known that his own actions were the cause of his frustrations and yet, this litigation persists. It is time for it to end, Plaintiff has no legitimate claim against Experian and this case should be summarily dismissed.

## BACKGROUND

### I.    LEGAL LANDSCAPE

This case arises under the FCRA and involves Experian's reporting of Plaintiff's Chapter 13 bankruptcy case. For background, this brief begins with an overview of the pertinent provisions of the FCRA and the U.S. Bankruptcy Code, both of which are central to this case.

#### A.    The Fair Credit Reporting Act.

The FCRA seeks "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The Act generally requires a credit reporting agency ("CRA") to use reasonable procedures to ensure maximum possible accuracy of consumer credit information, *see* 15 U.S.C. § 1681e, and to reasonably investigate consumer disputes about the accuracy of credit information, a process called "reinvestigation," *see id.* § 1681i. Additionally, the Act governs the content of consumer reports and to whom and for what purpose the reports may be furnished and specifically allows  reporting of certain bankruptcy-related information. *See, e.g.*, *id.* §§ 1681b, 1681c.

#### B.    Chapter 13 of the U.S. Bankruptcy Code.

In a Chapter 13 bankruptcy a debtor with regular income may keep her assets and propose a "plan" to pay creditors over time. *See* 11 U.S.C. § 109(e); 11 U.S.C. §1301 *et seq*; *In re Witkowski*, 16 F.3d 739, 740 (7th Cir. 1994). Because of their nature, Chapter 13 bankruptcies can be complicated, particularly with the treatment of secured debts. At the outset, a debtor is

required to complete a number of schedules, including Schedule D, which lists all of the debtor's secured creditors, and Schedule F, which lists the debtor's unsecured creditors. *See* U.S. Bankruptcy Court, Instructions – Bankruptcy Forms for Individuals, 17, 20, (Apr. 2016).[1] The debtor verifies the accuracy of these Schedules under penalty of perjury. *See id* at 14. Failure to properly list creditors on these Schedules can result in those debts being excluded from the discharge order. *See*, *e.g.*, *In re Smith*, 582 F.3d 767, 770 (7th Cir. 2009).

A Chapter 13 debtor can provide for her secured creditors by paying them through the trustee, paying them outside of the plan via direct payments to the creditor, or by the debtor surrendering the collateral back to the creditor. *See, e.g.,* 11 U.S.C. § 1325(a)(5). If a debtor completes her plan obligations, her debts are discharged and her case is then closed. *See* 11 U.S.C. § 1328(a). Failure to meet the plan's requirements can lead to dismissal of the case. *See* 11 U.S.C. § 1307(c). Chapter 13 plans can take years to complete, and even after a discharge is granted, it can be revoked up to a year later. *See* 11 U.S.C. §§ 1322(a)(4), 1328(e).

## II.  FACTUAL BACKGROUND

### A.  The Parties

Plaintiff Michael Robert Pappas is a "consumer," and Defendant Experian is a "consumer reporting agency" under the FCRA. (SOF ¶¶ 1-2.)[2] As a CRA, Experian collects consumer credit information from various sources, organizes and stores the information, and then makes it available to authorized third parties, like lenders. (*Id*. at ¶ 2.) Experian maintains credit information about Plaintiff. (*Id*.)

---

[1] The Bankruptcy Court's Instructions are available at http://www.uscourts.gov /file/18169/download.

[2] "SOF" refers to Experian's Rule 56.1 Statement of Undisputed Material Facts filed concurrently herewith.

## B.    Plaintiff's Chapter 13 Bankruptcy

In addition to his work as a credit analyst and loan originator in the commercial insurance industry, which netted him a healthy six-figure salary, over the years Plaintiff has invested in a number of real estate deals, generally buying single-family homes and renting them to long-term tenants. (*Id.* at ¶¶ 5-6.) This case deals with three of Plaintiff's rental properties in Illinois, one in Plano, one in Plainfield, and one in Diamond. (*Id.* at ¶ 6.) When Plaintiff filed bankruptcy, the loans for these properties were held by U.S. Bank and Cenlar. (*Id.*)

In the years leading up to Plaintiff's 2013 bankruptcy, the value of these three properties fell significantly, so much so that the value of the properties was greatly outweighed by the debt against them, a condition commonly known as being "underwater." (*Id.* at ¶ 7.) In addition to these three underwater properties, Plaintiff also had multiple other investment properties that were "above water." (*Id.*) Unable to sell the underwater properties without taking a financial loss, Plaintiff investigated other ways he could get rid of them without having to pay the difference between the value of the properties and the amount owed on the mortgage loans. (*Id.* at ¶¶ 8, 13.) Searching online, he found the Sulaiman Law Group's website, which advertised that he could "sever" the banks' mortgage liens from his personal liability by surrendering the properties. (*Id.* at ¶ 13.) He also learned that he could still keep his profitable above water mortgages. (*Id.*) The only downside to all of this, Plaintiff learned, was that his credit would be negatively impacted for seven years. (*Id.* at ¶ 14.) After deciding this was his best option, Plaintiff filed for Chapter 13 bankruptcy on April 27, 2013. (*Id.* at ¶ 6.)

Despite having the assistance of bankruptcy counsel, Plaintiff's petition contained a number of obvious errors. For instance, despite being significantly underwater, Plaintiff's Schedule D listed the unsecured portion of the loans against the Plano, Plainfield, and Diamond properties as $0. (*Id.* at ¶ 10-11.) Strangely, Plaintiff also listed Experian among his unsecured

creditors on Schedule F, despite knowing that he had never borrowed any money from Experian and that Experian was not, in fact, one of his creditors. (*Id*. at ¶ 12.) Though both Plaintiff and his lawyers swore on pain of perjury that his bankruptcy forms were accurate, Plaintiff now concedes that both Schedule D and F contain statements he knew were false at the time. (*Id*. at ¶¶ 10-12.)

Plaintiff's Plan treated his secured creditors quite differently, based on his desire to shed bad investments, while keeping good ones. (*Id*. at ¶ 15.) For his "above-water" properties, Plaintiff elected to pay those secured creditors outside of the plan, while in contrast, Plaintiff's Chapter 13 Plan[3] called for Plaintiff to surrender the Plano and Diamond properties to U.S. Bank and the Plainfield property to Cenlar "in full satisfaction of their claims." (*Id*.) Foreclosure proceedings were eventually filed against all three properties. (*Id*. at ¶ 16.) These foreclosure cases took significant time to conclude. (*Id*.) Indeed, the last foreclosure sale, on the Diamond property, was not approved until June 6, 2016. (*Id*.)

Plaintiff's bankruptcy plan was confirmed on September 23, 2013. (*Id*. at ¶ 15.) The bankruptcy court then entered a discharge order on February 4, 2014. (*Id.* at ¶ 19.) The court's discharge order is general in nature, and does not specify which of Plaintiff's myriad debts are, or are not, subject to the discharge. (*Id*.) Instead, the order instructs the reader to consult an attorney to determine the effects of the order. (*Id*.)

Plaintiff entered bankruptcy hoping to get out of his underwater properties while keeping his above-water properties, which he did. (*Id*. at ¶ 8.) These maneuvers paid handsome dividends. As soon as he filed for bankruptcy, Plaintiff stopped making mortgage payments on

---

[3] Plaintiff filed two Chapter 13 plans in his bankruptcy case. The first was filed with his petition, while a second, modified plan, was filed in response to a creditor's objection. The treatment detailed here applies to both plans.

the underwater properties included in the Plan.  (*Id*. at ¶¶ 17-18.)  Nevertheless, he continued to have tenants in the properties who were paying rent, both during and after the bankruptcy, but did not turn that rent over to his creditors or the bankruptcy trustee, because, despite "surrendering" the properties, he believed the properties were still rightfully his until the banks had completed the foreclosure processes.  (*Id*. at ¶¶ 17-18.)  All told, Plaintiff walked away from nearly $100,000 in underwater debt, while collecting nearly $65,000 in rent collected after he stopped paying his mortgage.  (*Id*. at ¶¶ 10, 18.)

### C.  Experian's Bankruptcy Reporting Policies and Procedures.

Experian obtains information about consumer bankruptcies in three ways.  First, through its public records vendor LexisNexis Risk & Information Analytics Group, Inc. ("Lexis").  (*Id*. at ¶ 27.)  Second, not being a proper party to the bankruptcy itself, Experian relies on individual creditors (also called data furnishers) to obtain account-level information.  (*Id*. at ¶ 29.)  Data furnishers can report if a particular account was included in a consumer's bankruptcy, whether that account was discharged in bankruptcy, and in the case of a Chapter 13 bankruptcy, any effects of the bankruptcy plan on the account.  (*Id*. at ¶ 30.)  Third, individual consumers are also able to dispute any information they believe is reporting inaccurately in light of their bankruptcy, including whether an account was included in the bankruptcy and the impact of a Chapter 13 plan.  (*Id*. at ¶ 31.)  Any account reporting as discharged in bankruptcy will report to third-parties as having a $0 balance and no monthly payment obligation.  (*Id*. at ¶ 33.)

### D.  Experian's Bankruptcy-related Reinvestigation Procedures

When a consumer disputes information on their credit file, Experian's response usually involves a reinvestigation of the disputed information.  (*Id*. at ¶ 34.)  For some disputes Experian is able to resolve the issue internally, either based on proof provided by the consumer, or based on Experian's own policies.  (*Id*.)  When Experian is able to resolve disputes internally, Experian

will automatically send a Dispute Response Notification (DRN) to the data furnisher to notify it of the changes made, as well as provide a summary of why Experian made the change. (*Id.* at ¶ 36.) Where a change is made based on Experian's internal policies, the DRN will indicate that fact, but it will not include any documents sent by the consumer. (*Id.* at ¶¶ 37-38.) For example, when a consumer contacts Experian and informs them that particular accounts were included in their Chapter 13 bankruptcy, Experian will internally update those accounts if a) Experian already has record of a bankruptcy on the consumers' file, and b) the account was opened before the bankruptcy was filed. (*Id.* at ¶¶ 40-41.) Experian will process this type of dispute the same way, whether the consumer makes it by phone, internet, or mail. (*Id.* at ¶ 40.) This type of dispute results in a DRN being automatically sent to the data furnisher explaining that Experian made the changes reflected based on its policies. (*Id.* at ¶ 43.)

### E. Plaintiff's Vacation Home Purchase, Dispute to Experian, and Experian's Response.

In the Spring of 2015, roughly one year after his bankruptcy was discharged, and before the foreclosure process was complete on the Plano, Plainfield, and Diamond properties, Plaintiff decided that he wanted to buy a second vacation home. (*Id.* at ¶ 21.) He became particularly interested in a lake front property in Stockbridge, Wisconsin. (*Id.* at ¶ 25.) He began to discuss the potential of obtaining mortgage financing to make the purchase with mortgage brokers Michael Ferrell and Fred Turk. (*Id.* at ¶¶ 21, 23-24.)

Although Plaintiff had pulled his annual credit report in March 2014, he had determined that it was not worth his time to send a dispute to Experian regarding the reporting of either his U.S. Bank or Cenlar accounts. (*Id.* at ¶ 20, 45.) Thus, those accounts were being reported by Experian in the same manner prescribed by U.S. Bank and Cenlar. (*Id.* at ¶ 46.) In particular, U.S. Bank was reporting loans for both the Plano and Diamond properties as discharged through

a Chapter 7 bankruptcy, while Cenlar had not yet indicated that the Plainfield property was included in bankruptcy, but was reporting that foreclosure proceedings had begun. (*Id*. at ¶ 45.) In the course of seeking a mortgage, Plaintiff was provided a tri-merge credit report from SettlementOne containing information from all three national credit bureaus, Equifax, TransUnion, and Experian. (*Id*. at ¶ 22.) The SettlementOne report showed outstanding balances, past-due information, and indications that foreclosure proceedings had begun for Plaintiff's U.S. Bank and Cenlar accounts (*Id*.) There is no dispute that as of that date foreclosure proceedings had in fact begun on those properties and that the proceedings were not yet complete. (*See id*. at 18.)

In response to Plaintiff's inquiries about his ability to qualify for a mortgage for his second vacation home purchase, Messrs. Ferrell and Turk reviewed Plaintiff's credit report. (*Id*. at ¶¶ 23-24.) According to Plaintiff, both brokers noted that the properties were in ongoing foreclosure proceedings explained to Plaintiff that, until the foreclosure process was complete on the homes Plaintiff had surrendered, he would not be able to obtain mortgage financing. (*Id*.) Plaintiff explained to the brokers that he had severed these loans and was no longer personally liable on them and provided evidence to that effect, but this made no difference to the brokers, who maintained that they would not be able to offer Plaintiff a mortgage until the foreclosures were complete. (*Id*. at ¶ 24.) In the end, even Plaintiff realized that the incomplete foreclosures were what kept him from qualifying for a mortgage. (*Id*.)

Plaintiff decided that rather than waiting for the foreclosure proceedings to complete, he would instead buy a vacation home with cash. (*Id*. at ¶¶ 25- 26.) To that end, Plaintiff liquidated stocks held in a brokerage account and purchased a different and slightly less expensive lake front home in Hilbert, Wisconsin, about ten miles from the Stockbridge property. (*Id*. at ¶ 25.)

Plaintiff concedes that even had he been able to purchase the Stockbridge property, he would have liquidated much, if not all of his brokerage account in order to minimize the size of the mortgage required. (*Id*. at ¶ 26.)

On May 26, 2015, Plaintiff sent a dispute letter to Experian, asking Experian to "update the subject credit file(s) to reflect the discharge status of the debts" and specifically asking for a reinvestigation into the U.S. Bank and Cenlar accounts. (*Id*. at ¶ 47.) Experian's records indicate that they actually received two copies of Plaintiff's dispute letter, the first received on May 28, 2015, and the second on June 1, 2015. (*Id*.) Experian logged these as two separate disputes, but handled each in the same way. (*Id*. at ¶¶ 48, 51.) Experian updated multiple accounts in Plaintiff's credit file, including the U.S. Bank and Cenlar accounts, to reflect that they were included and discharged in Plaintiff's Chapter 13 bankruptcy. (*Id*.) When Experian processed the second dispute, it made the same updates, effectively re-confirming that the accounts were reporting as discharged in Plaintiff's Chapter 13 bankruptcy. (*Id*. at ¶ 51.)

After Experian updated the U.S. Bank and Cenlar accounts, they were reporting a $0 recent balance and no current monthly payment obligations. (*Id*. at ¶¶ 48, 51) Experian then sent DRNs to Cenlar and U.S. Bank, explaining the changes made and that Experian made them pursuant to its internal bankruptcy policy. (*Id*. at ¶¶ 49, 51.) After updating the reporting of the accounts to reflect the $0 balance and the bankruptcy discharge, Experian sent Plaintiff a new consumer disclosure reflecting the changes made to his file. (*Id*. at ¶ 50-51.)

### F. The Account History Block.

Certain subscribers continue to report balance and scheduled payment information to Experian even when those accounts may not be collectible by the creditor. (*Id*. at ¶ 53.) When a subscriber provides this information to Experian, Experian will display the information in copies of consumer disclosures Experian provides to individual consumers in a block of the disclosure

labeled "Account history" (the "Account History Block").  (*Id*. at ¶ 52-53.)  It does so for two reasons.  One, consumers may find it interesting to know what information their creditors maintain regarding the balance history.  (*Id*. at ¶ 55.)  And two, because the FCRA requires Experian to provide consumers "all information in the consumers file . . . ."  *See* 15 U.S.C. 1681g(a).  The Account History Block is essentially informative for the consumer, letting the consumer know what information their creditors maintain internally.  Critically, Experian *does not include* the Account History Block information on credit reports it provides to creditors when a consumer applies for new credit.  (*Id*. at ¶ 56.)  Although Experian does rely on some of this information in the Account History Block to derive one ancillary product purchased by a small number of Experian clients  (*Id*. at ¶ 54), Experian's records for the time period following Plaintiff's bankruptcy do not show any inquiries on Plaintiff's file from the few clients who occasionally purchase the product derived from the Account history field.  (*Id*. at ¶ 58.)  Thus, no third party *ever* viewed the information in Plaintiff's Account history field on an Experian credit report.

Experian did not delete information contained in the Account History Block of Plaintiff's June 2015 disclosure for the U.S. Bank and Cenlar accounts.  (*Id*. at ¶ 52-53.)  After Plaintiff's dispute, the Account History Block for Cenlar showed a balance of $152,700 and a scheduled payment of $1,344 through May 2014, while the remaining U.S. Bank account was showing an account balance of $191,057 and scheduled payment of $2,102 from July 2013 to April 2015.  (*Id*.)

## III.   CLAIMS AGAINST EXPERIAN

Plaintiff's Amended Complaint alleges that Experian violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy when Experian prepared credit reports about Plaintiff  (Am. Compl. ¶ 66).  Plaintiff also alleges that Experian

violated 15 U.S.C. §1681i by failing to reasonably reinvestigate Plaintiff's dispute. Plaintiff amended his complaint to add an allegation that Experian violated §1681i(a)(2) by failing to provide all relevant information regarding Plaintiff's dispute to U.S. Bank and Cenlar. (Am. Compl. ¶ 70.) Plaintiff claims that Experian's violations were both negligent and willful. (*See id.* at ¶ 83; 15 U.SC. §§ 1681n-o.)

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Crawford v. Countrywide Home Loans, Inc*., 647 F.3d 642, 647 (7th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Viewing "the evidence in the light most favorable to the nonmoving party, . . . [a] genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the non-moving party." *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986) (internal citations omitted).

## ARGUMENT

Plaintiff's claims fail for a host of reasons. First, all of Plaintiff's claims require a showing of actual damages caused by inaccurate reporting. Plaintiff fails that initial hurdle, as

any supposed damage suffered by Plaintiff related to his inability to secure yet another mortgage was caused by Plaintiff's own choice to file bankruptcy, and was the natural consequence of that choice. Second, with regard to Plaintiff's § 1681e(b) claim (requiring Experian to maintain reasonable procedures when preparing credit reports provided to third parties), Experian's general bankruptcy reporting procedures have been upheld as reasonable by the Seventh Circuit in a case with significant conceptual overlap to the theory Plaintiff alleges and the record here is devoid of any evidence of any unreasonable procedure on Experian's part. Third, as to Plaintiff's § 1681i claims (requiring Experian to reasonably reinvestigate consumer disputes), the evidence demonstrates that after receiving Plaintiff's dispute, not only did Experian make the exact changes Plaintiff asked for, it provided U.S. Bank and Cenlar notice of Plaintiff's dispute and the reasons for Experian's changes. Finally, Plaintiff cannot meet the exacting standard required to sustain a claim for a willful violation of the FCRA.

There are no disputed issues of material fact in this case. Instead, Experian's liability, or lack thereof, turns entirely on questions of law about Experian's procedures and reinvestigation of Plaintiff's dispute. This case is ripe for summary judgment, and as explained below, Experian is entitled to judgment as a matter of law on all of Plaintiff's claims.

## I. PLAINTIFF CANNOT ESTABLISH DAMAGE CAUSATION.

To prevail on his negligence based claims under §§ 1681e(b) and 1681i Plaintiff "must raise a question of material fact on each of four elements: (1) that there was inaccurate information in his consumer credit report, (2) that the inaccuracy was due to Experian's failure to follow reasonable procedures to assure accuracy, (3) that he suffered actual damages, and (4) that those damages were caused by the inaccuracy." *Sarver v. Experian Info. Sols., Inc.*, 299 F. Supp. 2d 875, 876 (N.D. Ill.), *aff'd sub nom. Sarver v. Experian Info. Sols.*, 390 F.3d 969 (7th Cir. 2004). Because Plaintiff cannot show that his purported damages were caused by Experian and

because Experian's procedures are reasonable as a matter of law, Plaintiff cannot prove his case. Experian is thus entitled to summary judgment as to Plaintiff's allegations of negligence.

Although the FCRA ultimately requires that Experian's procedures and reinvestigation be reasonable "the reasonableness inquiry is unnecessary until the plaintiff has 'show[n] that she suffered damages as a result of the inaccurate information.'" *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 603–04 (7th Cir. 2006) (quoting *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005)). "Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.'" *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001). Here, there is no causal relation between Experian's reporting and Plaintiff's alleged damages because the undisputed facts show that the only cognizable damage Plaintiff suffered (the supposed inability to obtain new mortgage financing) was the result of Plaintiff's own choices, not any of the alleged violations by Experian.

*First*, of the "various types" of damages Plaintiff alleges (*see* Am. Compl. ¶ 58), discovery has shown that only his inability to obtain a mortgage to buy his second vacation home is a candidate to sustain his negligence claims. For instance, Plaintiff has not produced any evidence of other credit denials, and although his pleading alleges that he suffered emotional damages, he testified that he is not asserting that claim after all, and, in any event, offered only his own, self-serving, testimony to support any supposed emotional damages, which is not sufficient to defeat summary judgment. *See Sarver*, 390 F.3d at 971 (explaining that the Seventh Circuit maintains "a strict standard for a finding of emotional damage" and such claims must be supported by more than Plaintiff's own statements); *see also* SOF ¶¶ 60-61. Likewise, Plaintiff's ill-conceived attempt to characterize liquidating his brokerage account to buy the Hilbert

property as damage falls flat. "Actual damages . . . require a showing of harm." *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 302 (N.D. Ill. 2005) (citation omitted). Rather than being a possible cause of damage, Plaintiff's decision to buy a house with cash rather than waiting out a mortgage was simply a decision on Plaintiff's part to replace one investment (stocks) with another (real estate). As it turns out, the decision was actually a wise one, as the property has increased in value significantly, while the stock market has been volatile. (*See* SOF ¶ 26.) Moreover, Plaintiff would have made the same decision had he been able to obtain a mortgage on the Stockbridge property. (*See id.*) In any event, Experian is not responsible for and did not cause Plaintiff's investment strategies.

*Second,* the record leaves no doubt – indeed Plaintiff admits – that the reason Plaintiff could not obtain a mortgage was the fact that lenders were not willing to lend to Plaintiff until the properties he had surrendered in his bankruptcy had completed the foreclosure process. (*See* SOF ¶¶ 23-24.) It is indisputable that the properties in question had not yet completed the foreclosure process—thus, Plaintiff was not getting his mortgage regardless of what Experian did or did not do. There is also no evidence whatsoever that, had Experian been reporting the U.S. Bank and Cenlar accounts as discharged in Plaintiff's bankruptcy, he would have been able to secure financing. To the contrary, Plaintiff provided one broker proof that he was no longer personally liable on the debts, but the broker did not care and it did not change the underwriting decision. (*See* SOF ¶ 24.) In fact, it strains credulity to consider Plaintiff's inability to obtain mortgage financing "damage" at all, as he was benefiting greatly from the fact that the foreclosures had not completed on the subject properties by collecting rent on these properties without paying a dime to his creditors.

In the end, Plaintiff has no one to blame but himself for his supposed damages. He chose to walk away from his obligations via bankruptcy, and that decision has consequences, including, as Plaintiff knew full-well, difficulty obtaining credit post-bankruptcy. It is hardly surprising that mortgage lenders were unwilling to lend to Plaintiff after he had just recently left U.S. Bank and Cenlar holding the bag for a deficiency approaching $100,000. Even Plaintiff agreed that it "absolutely" made sense that banks were reluctant to lend to him in the aftermath of his bankruptcy. (*See* SOF ¶ 14.) With that backdrop, it would be nearly impossible for anyone to secure a mortgage, and Experian is not to blame. *See, e.g., Molina v. Experian Credit Info. Sols.,* No. 02 C 5561, 2005 WL 5525336, at *5 (N.D. Ill. Jan. 19, 2005) (noting that Plaintiff "wisely abandons" a claim for actual damages where "he had several other blemishes on his credit record").

Without a showing that Experian's alleged violations caused him any actual damage, the Court's analysis of Plaintiff's negligence claims can end here as Experian is entitled to summary judgment on these claims.

## II. EXPERIAN'S GENERAL CHAPTER 13 BANKRUPTCY REPORTING PROCEDURES ARE REASONABLE.

The FCRA is not a strict liability statute. *See, e.g., Ruffin-Thompkins*, 422 F.3d at 608. Rather than requiring perfection from a credit reporting agency, the FCRA requires only that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Plaintiff claims that Experian's reporting of his U.S. Bank and Cenlar accounts amounted to a violation of § 1681e(b) on Experian's part, thereby alleging that Experian failed to maintain reasonable procedures to assure maximum possible accuracy when it prepared credit reports listing those accounts. This claim fails as an

initial matter because Plaintiff has failed to demonstrate damage causation, *see supra* at 13-15, but even assuming that Experian caused any damage to Plaintiff, Experian remains entitled to summary judgment because Experian "is not liable under the FCRA if it followed 'reasonable procedures to assure maximum possible accuracy . . . .'" *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir. 1994) (quoting 15 U.S.C. 1681e(b)).

## A. Experian's Procedures Were Reasonable Prior to Receipt of Plaintiff's Dispute.

Prior to receiving Plaintiff's May 2015 dispute, Experian was not put on any kind of notice to suspect that there was anything wrong with its reporting of Plaintiff's U.S. Bank and Cenlar debts. As described, the FCRA is not a strict liability statute, and perfection is not required (or expected). Here, Experian obtained the general public record information about his bankruptcy from Lexis, and the account-level specific information from U.S. Bank and Cenlar. (*See* SOF ¶ 44, 46.) As a matter of law, a credit reporting agency like Experian follows reasonable procedures when it relies on information obtained from a presumptively reasonable source. *See Henson*, 29 F.3d at 285 (reporting information obtained from a court's docket is reasonable as a matter of law); *Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747 (7th Cir. 2015) (reliance on LexisNexis for bankruptcy reporting is reasonable as a matter of law). Moreover, the FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Sarver*, 390 F.3d at 972 (citation omitted).

There is no genuine dispute that Experian relied on presumptively reliable sources of information to report Plaintiff's bankruptcy, nor is there even an allegation that Experian had any notice of systematic problems with its procedures. Just last year, the Seventh Circuit upheld

Experian's reliance on Lexis in a case very similar to this one. *See Childress*, 790 F.3d at 745. In *Childress*, the Seventh Circuit rejected an argument that would require Experian to have someone with some bankruptcy training, monitor court dockets and classify bankruptcy dismissals as voluntary or involuntary. *See id* at 746-47. Plaintiff implicitly asks for this Court to require Experian to employ a similar procedure here, suggesting that, by listing Experian on his bankruptcy schedules, the Bankruptcy Noticing Center effectively served Experian with all significant filings in Plaintiff's bankruptcy case and Experian should engaged in deep dive research on the status of accounts and should have updated Plaintiff's file accordingly. (*See Am. Compl.* at ¶¶ 18, 22, 32.)[4] Plaintiff's suggested procedure is unquestionably unreasonable. Chapter 13 bankruptcies are complex, often years long, proceedings that can take a variety of turns and an individual debtor can muddy the waters by "surrendering" property, but continuing to collect rent and assert his rights to do so for years after the discharge. *See supra* at 3-6; *see also Hupfauer v. Experian*, No. 16-cv-0475, 2016 WL 4506798 * 7 (N.D. Ill. Aug. 23, 2016) (stating that determining whether a particular account was included in a discharge "is precisely the kind of legal question that credit reporting agencies are neither qualified nor obligated to answer"); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (the legal validity of a mortgage loan "is not a factual inaccuracy . . . but rather a legal issue that a credit agency . . . is neither qualified nor obligated to resolve under the FCRA").

---

[4] Notably, the Bankruptcy Court expressly informs debtors that "The bankruptcy court does NOT perform any activities with the credit bureaus." *See* "How do I get my bankruptcy removed from the Credit Bureau's record?", Bankruptcy Court for the Northern District of Illinois, *available at* http://www.ilnb.uscourts.gov/faqs/answer?fid=149&cid=5&pid=136&guid=FAQ_57bdfdbb728f5.

### B.    There Are No Inaccuracies Post-Dispute

Experian's procedures worked perfectly as to Plaintiff.  Experian, which was not a party to Plaintiff's bankruptcy, relied on U.S. Bank and Cenlar to provide it updates on the status of Plaintiff's accounts.  Experian then reported those accounts as advised by those furnishers. Plaintiff, who reviewed this information in March 2014, waited until late-May 2015 to contact Experian, advising them for the first time that those accounts were discharged in Plaintiff's bankruptcy.  Experian immediately updated the reporting, which is precisely how the system was designed to work.  After the update, Experian indisputably provided only accurate information in all consumer reports issued to third parties about Plaintiff.  *See supra* at 10-11.  For this reason, Plaintiff's § 1681e(b) related to all post-dispute reporting fails.  *See*, *e.g.*, *Henson*, 29 F.3d at 284 (holding that liability under §1681e(b) requires the existence of an inaccurate credit report).

Put together, Plaintiff's entire § 1681e(b) claim must be dismissed.  Experian's pre-dispute reliance on U.S. Bank and Cenlar was reasonable as a matter of law.  Perfection is not required, and failure to attain perfection does not create a claim.  After the dispute, no inaccurate credit reports were created, destroying any possible claim.  Thus, Experian maintained reasonable procedures at all times with regard to Plaintiff's U.S. Bank and Cenlar accounts, and the § 1681e(b) claim should be summarily dismissed.

## III.    EXPERIAN REASONABLY REINVESTIGATED PLAINTIFF'S DISPUTE

When Experian receives a dispute from a consumer, the FCRA requires Experian to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . ."  15 U.S.C. § 1681i(a).  Liability under § 1681i does not begin until the consumer has notified the CRA of a potential error in his credit report because "[t]he consumer is in a better position than the credit reporting agency to detect errors."  *Ruffin-Thompkins*, 422 F.3d at 608 (internal quotation omitted).  The FCRA also requires Experian to provide prompt

notification to the data furnisher, *see* 15 U.S.C. §1681i(a)(2), review all relevant information received from the consumer, *see id.* at § 1681i(a)(4), and delete or modify any inaccurate information after completing the reinvestigation, *See id.* at § 1681i(a)(5)(A), and then send the consumer an updated disclosure. *See id.* at § 1681i(a)(6).

### A.    There is No Evidence of an Inaccurate Credit Report.

As described above, the fact that Experian did not issue any inaccurate credit reports after receiving Plaintiff's dispute destroys Plaintiffs claim under § 1681e(b) related to post-dispute reporting. That same fact is also the death knell for Plaintiff's entire claim under § 1681i. In the Seventh Circuit, as elsewhere, the existence of an inaccuracy in a credit report provided to a third party after Plaintiff's dispute is a *prima facie* requirement for a plaintiff to pursue any claim under § 1681i. *See Henson*, 29 F.3d at 284; *Wantz*, 386 F.3d at 833–34. The FCRA distinguishes between consumer disclosures, which are sent only to the consumer, and consumer credit reports: "[t]here is no consumer report unless there is a 'communication . . . for the purpose of serving as a factor in establishing the consumer's eligibility for' credit or other statutorily enumerated purposes . . . i.e., there cannot be a consumer report without disclosure to a third party." *Wantz.*, 386 F.3d at 833–34.

Once Experian received Plaintiff's dispute, it immediately updated the reporting of the U.S. Bank and Cenlar accounts to accurately report the discharged status and $0 balance. *See supra* at 9. The remaining Account History Block has never been included on a credit report, *see supra* at 9-10, thus, no inaccurate credit report was provided to any third parties post-dispute. Plaintiff's § 1681i claim thus fails this initial *prima facie* hurdle, and it must be dismissed.

### B.    Plaintiff Has Not Suffered Any Post-dispute Damage.

As with the claims under § 1681e(b), Plaintiff's § 1681i claims require a showing of actual damages. For the reasons described above, the § 1681i claims fail for this reason alone.

There are, however, two additional reasons why Plaintiff cannot meet his burden of demonstrating damage causation as to the 1681i claims.

*First*, Plaintiff must demonstrate that Experian's supposedly faulty investigation caused him damage. Thus, any such damage must have occurred *after* the supposedly unreasonable reinvestigation. *See Sarver*, 390 F.3d at 971. Here, the only damages Plaintiff points to in this case relate to his supposed inability to secure a mortgage *prior to* his dispute with Experian. (*See* SOF ¶ 61.) Thus, even setting aside the many problems with Plaintiff's purported damages caused by Experian's pre-dispute reporting, *see supra* at 13-15, there is absolutely nothing in the record supporting a claim for damages caused by Experian's reinvestigation.

*Second*, Plaintiff's claims regarding Experian's reinvestigation focus on what Experian disclosed to Plaintiff in the Account History Block. But, as described above, this portion of Plaintiff's disclosure was provided only to Plaintiff, and was never provided to any third parties. *See supra* at 9-10. Because no third party ever saw or considered the Account History Block, it cannot have caused Plaintiff any damage. *See Crabill*, 259 F.3d at 664.

### C. Lack of Evidence of Unreasonable Reinvestigation.

Here, it is plain that Experian discharged its reinvestigation duties. Plaintiff sent Experian a dispute letter and attachments asking that Experian "update the subject credit file(s) to reflect the discharged status of the debts as indicated on the Final Report from the Trustee." (SOF ¶ 47.) Experian reviewed the documents Plaintiff submitted, and, based upon its internal policies, made the exact changes Plaintiff requested, including updating the U.S. Bank and Cenlar accounts to show a status of "Discharged through bankruptcy Chapter 13" and a $0 recent balance with no current monthly payment obligation. *See supra* at 9-10. After making these changes, Experian sent U.S. Bank and Cenlar DRNs informing them of the changes made,

specifically that these accounts were now reporting as discharged, and sent Plaintiff a revised consumer disclosure.  *See id.*

It is unclear from his Amended Complaint what, exactly, Plaintiff takes as unreasonable in Experian's reinvestigation.  He points to the continued reporting of information in the Account History Block of his disclosure (*see* Am Compl. at ¶¶ 53-54) and recently amended his Complaint to suggest that Experian did not notify U.S. Bank or Cenlar (*See id.* at ¶ 70; ECF No. 87 at ¶ 9 (stating "Experian's testimony established that the required notices under §1681i(a)(2) were not sent to the furnishers.").  Neither allegation render Experian's reinvestigation unreasonable.

*First*, although information remained in the Account History Block for the months after Plaintiff's bankruptcy, even if this information were inaccurate,[5] that alone does not render Experian's reinvestigation unreasonable.  *See, e.g., Benson v. Trans Union, LLC*, 387 F. Supp. 2d 834, 843 (N.D. Ill. 2005).  Here too, Plaintiff, cannot tether his § 1681i claims to the Account History Block because Experian never included it on a credit report given to a third party who was evaluating Plaintiff's creditworthiness.  *See supra* at 9-10; *Wantz*, 386 F. 3d. at 832-33.

*Second*, despite Plaintiff's unsupported allegations to the contrary, Experian did notify U.S. Bank and Cenlar of his dispute by sending a DRN reflecting the changes Experian made,

---

[5] In fact, this information is not inaccurate.  For one thing, in the Account History Block Experian is simply informing Plaintiff what the records of his creditors reflect.  For another, a bankruptcy discharge is an injunction against a creditor, not a declaration that a debt is void.  *See* 11. U.S.C. § 524(a).  The discharge does not extinguish the debt itself, rather  "a bankruptcy discharge extinguishes only one mode of enforcing a claim-namely, an action against the debtor *in personam*-while leaving intact another –namely, an action against the debtor *in rem*."  *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991); *see also In re Irby*, 337 B.R. 293, 295 (Bankr. N.D. Ohio 2005) (reporting a discharged debt is not inaccurate because "[a]ll that is being reported is the truth").  Until U.S. Bank and Cenlar had completed the foreclosure process, it was not inaccurate to report the accurate facts of those accounts, even if U.S. Bank's and Cenlar's legal options to enforce Plaintiff's obligations were limited.

specifically informing them that Plaintiff's accounts were now reporting as discharged in his bankruptcy. It is well-known in the credit reporting industry, that the CRAs resolve many of the disputes they receive internally. *See, e.g.,* Consumer Financial Protection Bureau, KEY DIMENSIONS AND PROESSES IN THE U.S. CREDIT REPORTING SYSTEM, 4 (Dec. 2012) (noting that "The NCRAs resolve an average of 15% of trade line disputes internally (without furnisher involvement)").[6] Nothing in the language of the FCRA suggests that this is improper. Rather, the FCRA's goal of an efficient banking system is plainly furthered when the CRAs can make updates to consumer credit files without waiting for the data furnisher to respond to a dispute. Similarly, there is no provision in the FCRA that requires a CRA to forward all documents it receives from a consumer related to a dispute to the data furnisher and courts have declined to read such a requirement into the statute. *See Benson* , 387 F. Supp. 2d at 843, n.6 ("the statute does not require a credit reporting agency to pass along all information received from a consumer"); *Paul v. Experian Info. Sols., Inc.*, 793 F. Supp. 2d 1098, 1103 (D. Minn. 2011) ("No language in the statute requires a CRA to forward documents to data furnishers to satisfy its obligation."); *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 754 (S.D. Tex. 2006), *aff'd*, 224 F. App'x 415 (5th Cir. 2007) ("Nothing in the FCRA requires Defendant to append a copy of the consumer's dispute letter.") Such a requirement would be inefficient where the summary of the dispute provided in e-Oscar is often sufficient. *See* Fed. Trade Comm'n, REPORT TO CONGRESS ON THE FAIR CREDIT REPORTING ACT DISPUTE PROCESS 34 (Aug. 2006) (noting that the CRAs do not always send documents to data furnishers and stating "By itself, however, this does not mean that CRAs fail to convey "all relevant information" to furnishers . . .this process may be

---

[6] The CFPB's report is available at http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf.

sufficient in most cases to resolve the dispute properly . . . ").[7] The relevant information in Plaintiff's dispute consisted entirely of identifying which accounts were included in his bankruptcy discharge, precisely the information communicated to each furnisher in the DRN. And, of course, where the resulting reporting was indisputably accurate, whether or not Experian sent anyone any documents no longer matters, since the purpose of the FCRA has been effectuated—fair and accurate credit reporting.

The undisputed facts in this case reveal it for the charade that it is. Not only has Plaintiff benefited greatly by leveraging the bankruptcy system to his favor – as opposed to suffering even a modicum of damage – he is suing Experian after it made the updates to his credit file that he asked for. Experian's procedures, both before and after Plaintiff's dispute were reasonable, and Experian is entitled to summary judgment accordingly.

## IV. EXPERIAN DID NOT WILLFULLY VIOLATE THE FAIR CREDIT REPORTING ACT

As previously noted, the FCRA is not a strict liability statute. Where, as here, the plaintiff seeks statutory damages under § 1681n, he must establish the element of willfulness. A defendant acts in willful violation of the FCRA where it acts in "reckless disregard of [its] statutory duty." *Safeco*, 551 U.S. at 57. This is an entirely objective inquiry. *See Van Straaten v. Shell Oil Prods. Co*., 678 F.3d 486, 492 (7th Cir. 2012) (Cudahy, J., concurring). As the Supreme Court has explained, a CRA does not act in reckless disregard of the FCRA unless its action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69.

---

[7] The FTC Report is available at https://www.federalreserve.gov/boarddocs/rptcongress/fcradispute/fcradispute200608.pdf.

Objective reasonableness is judged against the statutory text and any judicial or administrative guidance that existed at the time of the alleged violation. *See id*. at 69-70; *Murray v. New Cingular Wireless Servs., Inc*., 523 F.3d 719, 726-27 (7th Cir. 2008). In the absence of interpretive guidance that "might have warned it away from the view it took," a CRA's interpretation of "less-than-pellucid statutory text" cannot be "objectively unreasonable, and [thus] falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." *Safeco*, 551 U.S. at 70. This is so even if the CRA's "construction of the statute turns out to be mistaken." *Shlahtichman v. 1-800 Contacts, Inc*., 615 F.3d 794, 803 (7th Cir. 2010).

Here, Experian's procedures are objectively reasonable. The complicated nature of Chapter 13 bankruptcies explains why Experian's bankruptcy reporting procedures at issue in this case have been upheld by the Seventh Circuit. *See Childress*, 790 F.3d at 745; *see also Hupfauer*, 2016 WL 4506798, at *7 ("requiring a third party such as a credit bureau to determine whether a specific account was discharged in a particular consumer's Chapter 13 bankruptcy would impose an unfairly heavy burden on that party"). Plaintiff cannot show that Experian's bankruptcy reporting procedures are unreasonable, let alone objectively unreasonable to sustain his willfulness claims. Likewise, Plaintiff's amendment is an attempt to extend Experian's reinvestigation duties under § 1681i(a)(2) where courts have repeatedly declined to do so. *See supra* at 22-23. Even on the remote possibility that this Court agrees with Plaintiff that "all relevant information" in § 1681i(a)(2) is synonymous with "all documents," Experian cannot have willfully violated the FCRA by employing procedures that have been upheld by courts and regulatory authorities.

At bottom, this is not a case of Experian relying on a good-faith, but possibly mistaken interpretation of the FCRA. Experian's procedures in this case fall squarely within the guidance of case law. Instead, this is a case of a Plaintiff and his attorneys who, after already improperly leveraging the bankruptcy court to his own benefit, decided to double-down with litigation based on illusory damages and unsupported legal theories. There was no basis for Plaintiff's allegations at the outset of this case, and there is no support for them now. Experian did not violate the FCRA at all, let alone willfully, and is entitled to summary judgment on Plaintiff's claims.

## **CONCLUSION**

Experian respectfully requests that this Court enter summary judgment in its favor and dismiss all of Plaintiff's claims against it with prejudice.

Dated this 3rd day of October, 2016.     By: /s/ *Adam W. Wiers*

                                        JONES DAY

                                        Adam W. Wiers
                                        awwiers@jonesday.com
                                        Michael A. Zuckerman
                                        mzuckerman@jonesday.com
                                        Christopher A. Hall
                                        chall@jonesday.com
                                        77 West Wacker, Suite 3500
                                        Chicago, IL 60601.1692

                                        *Counsel for Defendant Experian*
                                        *Information Solutions, Inc.*

Case: 1:15-cv-11140 Document #: 102 Filed: 10/03/16 Page 32 of 31 PageID #:425

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

/s/ Christopher A. Hall